James R. **MURRAY**, Plaintiff–Appellant,

v.

**ABT ASSOCIATES INC. and Walter R. Stellwagen**, Defendants–Appellees.

No. 93–3096.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1994.

Decided March 15, 1994.

Order Denying Rehearing April 21, 1994.

Elliott E. Petlak, John J. Gaines, III, Huff & Gaines, Chicago, IL, Logan T. Johnston (argued), Johnston, Maynard, Grant & Parker, Phoenix, AZ, for James R. Murray.

Stuart Berks (argued), LaDonna M. Loitz, Deutsch, Levy & Engel, Chicago, IL, for defendants-appellees.

Before POSNER, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

In March 1988 James Murray was unemployed, having been released from his former position as Associate Director of the National Opinion Research Center (NORC). Murray opened negotiations with Abt Associates, which like NORC conducts survey research. Murray specializes in large-scale surveys for units of government; Abt wanted to enter that segment of the business. Murray proposed that Abt create and fund a subsidiary (Scientific Surveys, Inc., or SSI) to carry on these surveys. He envisaged that he and three former colleagues—Martin Frankel, Calvin Jones, and Mary Cay Burich, all still at NORC—would operate the subsidiary in Chicago (Abt's headquarters are in Massachusetts) and receive half of the subsidiary's equity. Walter Stellwagen, the chief executive of Abt, thought the concept good but the implementation problematic. Murray and colleagues (the Group) had not operated their own shop before, and the proposed operation would require a lot of Abt's money before producing a profit.

Abt was unwilling to promise that it would create SSI without first satisfying itself that the prospects for profit were good. Frankel, Jones, and Burich were reluctant to leave NORC while things were so uncertain. The Group's lawyer therefore proposed that Abt agree to employ the four for a minimum term even if SSI never came into being. Abt accepted and entered into two-year contracts of employment with each of the Group's four members. Then all four members of the Group, plus Stellwagen on behalf of Abt, signed a contract, the Proposed Term Sheet, setting forth in detail the terms on which the subsidiary would be created and funded, and who would own what portion of its stock—if Abt's board approved after studying "a three year business plan to be prepared and delivered on or before April 29, 1988." The last paragraph of this contract reads:

> Unless the definitive Agreements are executed and delivered by each party to the other on or before May 30, 1988, the matters set forth herein shall terminate and neither party shall have further rights against the other, excepting existing agreements of employment with each of the Major Shareholders [i.e., the Group]. [Abt] agrees, however, to pay all costs and expenses of the Major Shareholders incurred to professional advisors in negotiating the definitive Agreements, such costs and expenses not to exceed $25,000.

The Group's plan was not acceptable to Abt's board, which thought the projections unrealistic and insufficiently detailed. On May 25, 1988, the board voted not to establish SSI. Frankel presently returned to NORC; Murray, Jones, and Burich stayed on under the terms of their employment contracts and set about securing large-scale governmental survey work for Abt, in the hope that deeds

would speak more loudly than words. Stellwagen encouraged them in this course.

By 1991 the remaining three members of the Group had secured more than $50 million in business and believed that they had attained profitability. Stellwagen agreed and proposed that Abt create SSI as a subsidiary, although on terms that differed from those of 1988. There were two obstacles: (i) Abt had fired Murray, putting him on leave pending a last effort to create SSI; (ii) Jones and Murray were no longer on speaking terms. Jones rejected Abt's proposal to establish SSI under conditions that would commit him to an ongoing relationship with Murray, and Abt was unwilling to proceed without Jones's approval. Discussions collapsed, and Murray's discharge became final. (An employee at will after the two-year contract expired, Murray does not contest Abt's right to let him go.) Abt later reached a financial accommodation with Jones and Burich, who have remained with the firm.

On the street once again, Murray filed this suit under the diversity jurisdiction. Applying Illinois law (which the parties agree governs), the district court entered summary judgment for the defendants. The court concluded that the parties' conduct did not create any contract beyond the Proposed Term Sheet itself; because this agreement left Abt's board with discretion not to create a subsidiary, and because Abt fulfilled its promise to employ Murray for two years, the court held that he is not entitled to relief. The parties' actual contract left no room for recovery on a theory of unjust enrichment, the court thought, adding that Murray has not produced evidence that would support recovery on any other theory.

■ Like the district court, we believe that Murray received his due under the contract. Abt's board exercised a power, contemplated in the contract, not to establish SSI as a subsidiary. Under the parties' bargain, "neither party shall have further rights against the other, excepting existing agreements of employment"—and Abt honored those agreements. Murray insists, however, that the Proposed Term Sheet is not the whole agreement. After the board decided not to establish SSI as a subsidiary, Stellwagen sent the Group a letter inviting all four to remain as employees and to carry on the work that SSI would have conducted. Stellwagen wrote, among other things, that

"we would move along a course intended to eventuate in spinning off SSI as a corporation in which you had a significant ownership position." Other portions of the letter suggested that if the Group's operations fulfilled the goals in the business plan a spinoff could occur one to three years in the future. Murray depicts this as a legally enforceable promise.

■ Yet there is a gulf between a promise to work toward a goal and a commitment to accomplish that end. Just as the Proposed Term Sheet conditioned establishment of SSI on the board's approval, Stellwagen's letter conditioned further steps on success as Abt (which is to say, Abt's board) defined success. The letter was less of a commitment than the Proposed Term Sheet. Illinois permits parties to agree to negotiate, and to work toward some goal, without committing themselves to its achievement—or to pay damages if it is not achieved. *Empro Manufacturing Co. v. Ball–Co Manufacturing, Inc.*, 870 F.2d 423 (7th Cir.1989) (Illinois law); *Feldman v. Allegheny International, Inc.*, 850 F.2d 1217 (7th Cir.1988) (Illinois law); *Chicago Investment Corp. v. Dolins*, 107 Ill.2d 120, 89 Ill. Dec. 869, 872, 481 N.E.2d 712, 715 (1985); *Interway, Inc. v. Alagna*, 85 Ill.App.3d 1094, 41 Ill.Dec. 117, 407 N.E.2d 615 (1st Dist. 1980). By negotiating in detail the Proposed Term Sheet, and the consequences if SSI were not established, the parties evinced a desire for both formality and certainty in their dealings. Respect for the parties' autonomy in shaping their arrangements, and for the allocation of risks they selected, mean that a court ought not find in a letter such as Stellwagen's the very promise the more elaborate Proposed Term Sheet withheld. See E. Allan Farnsworth, 1 *Contracts* § 3.8 at 181–86 (1990). The Proposed Term Sheet was conditional; Stellwagen's letter, coming in the wake of the board's refusal to establish SSI, was more so. The district court explained:

> The letter ... begins by expressing that "there are a lot of details we will want to discuss." It then contemplates that the parties would work together "to develop a staged plan." No details or parameters of the plan are suggested. Much is left to future negotiation. The letter emphasizes that the parties need to achieve certain "goals" prior to the formation of the separate corporation; however, the goals are nowhere specifically stated.

These parties conducted complex negotiations through sophisticated commercial lawyers. They agreed that Abt's board could say no, with only the employment contracts remaining enforceable. The board said no. So much for the contract claim.

Resolution of the contract claim also disposes of Murray's resort to quantum meruit or unjust enrichment. Illinois does not permit recovery on a theory of quasi-contract when a real contract governs the parties' relations. *Borowski v. DePuy, Inc.*, 850 F.2d 297, 301 (7th Cir.1988) (Illinois law); *La Throp v. Bell Federal Savings & Loan Ass'n*, 68 Ill.2d 375, 12 Ill.Dec. 565, 572, 370 N.E.2d 188, 195 (1977); *Industrial Lift Truck Service Corp. v. Mitsubishi International Corp.*, 104 Ill.App.3d 357, 60 Ill.Dec. 100, 103, 432 N.E.2d 999, 1002 (1st Dist. 1982). Two real contracts apply: the Proposed Term Sheet and the contract of employment between Murray and Abt. Murray received $85,000 per year for his services. Now he says that they were worth more—that Abt found the large-scale survey business profitable even after paying the Group's salaries. Yet Murray agreed to accept a fixed salary in exchange for dedicated and skillful efforts. Abt could not reclaim the salary if the business proved to be unprofitable; Murray cannot demand more than the agreed salary just because the business is lucrative. *Restatement of Restitution* § 107 comment 1(a) (1937). SSI would have provided a vehicle for payments contingent on success. Because the subsidiary was not formed, and Abt was within its rights not to establish it, Murray is not entitled to recovery approximating the dividends SSI might have paid or the capital value its stock might have achieved.

Finally there is a cry of fraud. Stellwagen's statement that Abt will strive to establish SSI cannot be called "fraud" just because things did not turn out well. There is no fraud by retrospect. Only statements that were materially false when made—such as a promise Stellwagen had no intention of keeping—fit the description "fraud." Compare *Steinberg v. Chicago Medical School*, 69 Ill.2d 320, 13 Ill.Dec. 699, 706, 371 N.E.2d 634, 641 (1977), with *Roda v. Berko*, 401 Ill. 335, 81 N.E.2d 912, 915 (1948). This, however, drives us back to the conclusion that neither Stellwagen nor Abt made a promise to Murray beyond the Proposed Term Sheet and the two-year employment contract. Although Murray insists that Stellwagen pledged to work in good faith toward establishing SSI, and that Stellwagen did not (and never intended to) do so, we have concluded that Illinois does not permit recovery under the banner of fraud for promises to negotiate a contract. *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1445–46 (7th Cir.1992). At all events, there is precious little evidence of fraud, as opposed to an optimism that events did not vindicate. Stellwagen said in 1988 that he hoped to establish SSI in one to three years. By 1991, the third year, Jones and Murray were no longer cooperating, and Frankel was long gone. "Group" was no longer an apt term for the venture, and a fresh attempt to establish SSI faltered—scuttled by Jones rather than Stellwagen. A few tidbits, such as Stellwagen's coy and arguably deceitful handling of the fact that he recommended in May 1988 that the board not establish SSI at the time, are all Murray has, and they are not enough to permit a rational factfinder to conclude that Abt and Stellwagen defrauded him into remaining in Abt's employ for three years.

AFFIRMED

### ORDER ON REHEARING

April 21, 1994

Plaintiff–Appellant filed a petition for rehearing on March 29, 1994. This petition implies that Chief Judge Posner and Judge Easterbrook should recuse themselves if they are aware of the circumstances under which plaintiff departed from the National Opinion Research Center. Neither Chief Judge Posner nor Judge Easterbrook had heard of the plaintiff before this litigation; neither was aware, until reading the petition for rehearing, that plaintiff's departure from NORC had been a topic of discussion or controversy at the University of Chicago; there is accordingly no basis for recusal. All of the judges on the panel have voted to deny rehearing. The petition for rehearing is therefore denied.